[No. 24383. Department Two. December 15, 1933.]

# THE STATE OF WASHINGTON, *Respondent*, v. A. E. PIERCE, *Appellant*.[1]

[1]Reported in 27 P. (2d) 1083.

*Sam A. Wright* and *Henry Clay Agnew,* for appellant.

*Robert M. Burgunder* and *John F. Walthew,* for respondent.

HOLCOMB, J.—Appellant was charged, tried and convicted in the court below upon an information charging, as summarized: That he did, on or about March 6, 1931, as president and one of the trustees of the Washington Loan & Securities Company, wilfully, knowingly, falsely and feloniously make, publish and concur in making and publishing a written statement of the financial affairs and pecuniary conditions of the Washington Loan & Securities Company at the close of the business of that corporation on December 31, 1930, known by him, in a number of matters specified in the information, at the time thereof to be false.

The statute under which the prosecution was had was Rem. Rev. Stat., § 2642, denouncing such offenses under the general statute relating to corporations. It reads:

"Every director, officer or agent of any corporation or joint stock association, and every person engaged in organizing or promoting any enterprise, who shall knowingly make or publish or concur in making or publishing any written prospectus, report, exhibit or statement of its affairs or pecuniary condition, containing any material statement that is false or exaggerated, shall be punished by imprisonment in the state penitentiary for not more than ten years, or by a fine of not more than five thousand dollars."

For brevity, we will henceforth refer to the Washington Loan & Securities Company as the company.

A rather extensive history of that company, both under the management of appellant and its previous management under his father prior to January, 1927, when his father died, is recited in the briefs of both

parties. We do not consider that history material, since the only matters we deal with are the acts on the part of appellant during his management. He was manifestly the sole manager, except that one Bailey was secretary and office manager of the company. There were three trustees of the corporation, who had been elected as such under the management of the father of appellant, and were never displaced, but were never notified of any stockholders' or trustees' meetings, and never attended any.

The business of the corporation was that of floating bond issues in large amounts and selling them throughout this state, but particularly throughout Grays Harbor and Whatcom counties, although bonds were also sold to people in King county. The method of doing business by the company, under appellant, was detailed by Bailey, the secretary, and the system of selling securities by one Gallinger, a salesman and sales manager. Appellant kept under his own control the bank account, and all cancelled checks and statements from the bank were returned directly to him. The cash in the bank, as reflected upon the books of the company, was solely upon figures prepared by appellant.

Customarily, a financial statement of the company was prepared yearly showing the company's financial condition as reflected on the books. Bailey had been ill in a hospital for some time during the latter part of 1930, so that no financial statement showing the condition of the company had been prepared up to the close of the business on December 31, 1930. On February 16, 1931, the state supervisor of securities wrote to the company, requesting a later financial statement. On the following day, appellant, over his own signature, wrote to the supervisor, saying:

"In reply to your letter of February 16th relative to a copy of our last balance sheet, we will be able to

464

furnish this to you shortly, as we are just sending it to the printer. This statement is as of December 31, 1930.

. "Your very evident cooperation with us is deeply appreciated. Sincerely,

"WASHINGTON LOAN & SECURITIES COMPANY,
"Ahira E. Pierce, President."

Thereupon, a penciled work-sheet showing the financial condition was prepared by Bailey, from the books of the company. His work-sheet was then submitted by him to appellant, who made two additions thereto by inserting after the item "Stocks & Bonds Owned," the words "(Principally U. S. and Municipal Bonds)," and by inserting after the item "Loans on Collateral," the words "(Temporary loans to our own bondholders on their bonds)." These changes were in the handwriting of appellant, and the corrected work-sheet, as returned to Bailey, was used in entirety in making the statement of the financial affairs of the corporation as of December 31, 1930. The penciled work-sheet and the printed statement are identical in all respects. The printed statement was completed some time after March 1, 1931. On March 7, 1931, appellant enclosed one of the printed statements with a letter, over his signature, to the state supervisor of securities, in Olympia, where it was received by him.

The printed statement discloses that the bond issues outstanding at the close of business for the year 1930 totaled $1,740,918.92. These funds were supposed to be invested in high grade securities in the possession of appellant. The statement showed that there existed assets in the possession of the company totalling $2,126,590.23. Among other items shown was "mortgages owned" at $1,547,250. A few of the most pronounced discrepancies between the actual facts and the pretended facts will be here set forth.

When the receiver took possession of the assets and the affairs of the company and of the alleged $1,547,250 worth of mortgages and asked appellant about them, he stated to the receiver that the mortgages "just weren't." The company actually owned at that time a few second mortgages and real estate contracts of the doubtful value of about $39,939. It owned no stocks and bonds as stated in the financial statement. It had owned a number of stocks and bonds, including United States Treasury certificates and many thousands of dollars in Liberty bonds, which had been disposed of prior to January 1, 1931. Of the item of $78,716.70, listed as "cash in banks" in the statement, the bank balance at that time showed $38,886.76, against which were checks outstanding which, when presented, reduced the bank balance to $6,767.14.

On March 12, 1931, Bailey, the company secretary, prepared the draft of a letter to be sent out to their customers addressed "To our Bondholders," stating that therewith was enclosed a copy of their last financial statement, in which it was known they would be interested. Other assurances were also embodied in the letter, which we do not consider important. Both Bailey and Gallinger, the sales manager, testified that, after that letter was prepared, it was mimeographed in quantities and sent out to the bondholders along with the financial statement. The stenographer in the office of the company also testified that the printed statements above mentioned were given to all bond salesmen working on the outside, as well as to anyone who came and asked for one.

Appellant did not take the stand, and all the evidence above referred to, with other details not necessary to recite, was undisputed. It is manifest that the statement was utterly false, and the information it

set out extremely misleading, respecting the assets of the company.

The first error assigned by appellant is in denying his challenge to the sufficiency of the evidence.

It is argued that the statute, § 2642, *supra,* has no application to the facts presented on the trial in this case. *State v. O'Brien,* 143 Wash. 636, 255 Pac. 952, is cited and relied upon to sustain the contention that § 2642, *supra,* applies only to misleading statements designed to deceive the public, and cannot apply to stockholders and bondholders of this company.

The *O'Brien* case, *supra,* does not sustain that contention. Another section, besides § 2642, *supra,* is also discussed in the *O'Brien.*case, Rem. Rev. Stat., § 3829. It was there held that (1) § 3829, *supra,* making it a crime for an officer of a corporation to publish, either generally or privately, any wilfully false report of the business or condition of the company with intent to defraud, applies to private publications to the stockholders or others dealing with the corporation; hence had not impliedly repealed § 2642, *supra,* making it a felony to knowingly make any false report as to the financial condition of the company, which applies to public reports; (2) that evidence of the making of a false annual report to the stockholders of a corporation, made a crime by § 3829, when made with intent to deceive, does not sustain a conviction under § 2642, *supra,* making it a crime to knowingly make any false statement to the public as to the financial condition of the company, irrespective of intent to defraud.

In that opinion, we said:

"This public policy, however, would not apply to directors who, by reason of their position, manage and direct the corporation, or its stockholders who are entitled to inspect the books of the company and participate in its affairs. As to them, the person who makes

the report should be held to answer for a crime only when the report was made with intent to deceive."

It was further said that § 2642, *supra,* applies to public reports, and § 3829, *supra,* applies to private publications to stockholders or others dealing with such corporations.

It is plain that § 2642, *supra,* was passed for the purpose of making it a crime to knowingly publish false reports to the public, although there was no intent to deceive or defraud. Its very purpose was to prevent such publications or punish the publishers thereof, and as was indicated in the *O'Brien* case, *supra,* to protect "the members of the public" who might rely thereon to their great loss, including bondholders, who are not generally stockholders of such companies.

In *State v. Comer,* 171 Wash. 25, 17 P. (2d) 643, we dealt with a prosecution under the statute relating to savings and loan associations which, so far as material, reads:

"Every person who . . . shall make, state or publish any false statement of the amount of the assets or liabilities of any savings and loan association shall be guilty of a felony." Rem. Rev. Stat., § 3743.

There, the gist of the offense was in making the false statement. It was not material in what manner the statement was published. In this case, the material elements of the offense are in making, or concurring in the making, of the false statement and publishing or causing its publication. Like that case, however, it is immaterial in this case whether the publishing of the statement of appellant was accomplished by newspaper advertising, a house to house distribution by a messenger, or by mailing the statements. And, as in that case, it is not essential here that the information state the names of the particular persons to

whom the false statement was given or published. These statements were left on the counter of the business office in Seattle, and given out or published indiscriminately to anyone who wished or would receive one.

Whether the financial statement was mailed, given out by hand, or otherwise distributed to five persons, or five thousand, is immaterial in a prosecution under § 2642, *supra*. They were intended to be and were generally distributed by appellant. The statute does not require that the charge be based on the publication to any particular person or persons; and proof that they were given to certain persons and received by them, whether bondholders or others, is corroborative proof of the publication of the false financial statement. The sending of the statement to the state supervisor of securities, although required by the securities act not to be given out or published, is no more than corroborative evidence against appellant that he authorized the compilation of the false financial statement to promote his own fraudulent purposes.

 The second assignment of error by appellant is in refusing to require the state to elect upon what act of publication it would rely for conviction.

It is asserted that the prosecution introduced evidence which, if believed by the jury, would tend to prove at least five acts of publication. We do not so consider. If an election had been required, it would have brought this case within the rule of *State v. O'Brien, supra,* which would have defeated the prosecution. All that was necessary for the prosecution to prove under this statute was that the financial statement was wilfully, knowingly, and falsely made, published and concurred in by appellant, and that it was a false statement of the financial condition of the

company as at the close of the business on December 1, 1930. This, we have seen, it positively was. The testimony that the false financial statement reached certain persons was some direct evidence for the jury to consider that they were published. The fact that they reached the state supervisor of securities was also only corroborative evidence to the same end.

■ The third complaint of error by appellant is in refusing to give a requested instruction reading:

"You are instructed that the delivery of a copy of the statement set forth in the information to the witness C. H. Bowen, supervisor of securities of the state of Washington, is not a publication and does not in itself constitute the offense charged in the information."

Whether the mailing of the false statement to Bowen, state supervisor of securities, would constitute an offense under the securities act, is wholly immaterial. The sending of such statement intentionally is corroborative evidence of the assent or concurrence of appellant in the statements made in that financial report, whether Bowen received it in his official capacity or merely as one of the public generally. It constituted a publication to him. The trial court properly refused to give the instruction.

■ The fourth assignment of error is in the giving of the following instruction by the court:

"Under the laws of this state it is unlawful for any director or officer of any corporation to knowingly make or publish, or concur in making or publishing, any written statement of its affairs or pecuniary condition containing any material statement that is false or exaggerated.

"The word 'make' is defined substantially as follows: 'to cause to exist in certain forms; to fabricate; to produce; to execute; to compose or compile and then to issue or utter.'

"The term 'publish' means: 'To make public; to intentionally exhibit; to make known; to put in circulation.'

"The term 'concur' means: 'To act together; to agree; to assent to',"

and in refusing to give a requested instruction reading:

"Mere consent or approval of the making or publishing of a statement or report, standing alone, is not sufficient to constitute concurring in such making or publishing."

The definitions contained in the above instruction are assailed by appellant as being incorrect as applied to the language in the statute before us. The definitions in the instruction are the commonly accepted meanings of the words, and require little defining by a court. Cf. *State v. Thomas,* 123 Wash. 299, 212 Pac. 253, 33 A. L. R. 781, and cases therein cited. The standard dictionaries define concur as "to agree, to assent, to approve." Obviously, for a person to suffer and permit a thing to be done which he is legally bound to prevent, is to do more than to merely acquiesce therein. See, also, *State v. Pickel,* 116 Wash. 600, 200 Pac. 316, 204 Pac. 184.

We feel compelled to conclude that there was no error committed by the trial court in the giving or refusal of instructions.

Finding no error in the proceedings, the judgment is affirmed.

BEALS, C. J., TOLMAN, BLAKE, and GERAGHTY, JJ., concur.