IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| GREGG BECKER, | ) | No. 31234-8-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMUNITY HEALTH SYSTEMS, INC. | ) | PUBLISHED OPINION |
| d/b/a COMMUNITY HEALTH SYSTEMS | ) | |
| PROFESSIONAL SERVICES | ) | |
| CORPORATION d/b/a COMMUNITY | ) | |
| HEALTH SYSTEMS PSC, INC., d/b/a | ) | |
| ROCKWOOD CLINIC P.S.; and | ) | |
| ROCKWOOD CLINIC, P.S., | ) | |
| | ) | |
| Petitioners. | ) | |

BROWN, A.C.J. — Rockwood Clinic PS (Rockwood) and its parent company, Community Health Systems Inc. (CHS), successfully petitioned for discretionary review of a decision denying their CR 12(b)(6) motion to dismiss Gregg Becker's claim for wrongful discharge in violation of public policy. Rockwood and CHS contend Mr. Becker cannot establish the jeopardy element because a myriad of statutes and regulations adequately promote the public policy of honesty in corporate financial reporting, rendering a private common law tort remedy superfluous. We disagree with Rockwood and CHS, and affirm.

No. 31234-8-III
*Becker v. Cmty. Health Sys. Inc.*

## FACTS

In February 2011, Rockwood recruited Mr. Becker to be its chief financial officer (CFO), a job he performed admirably. CHS had acquired Rockwood with a business strategy to improve profitability. Upon doing so, CHS represented to investors and creditors it expected Rockwood to sustain a $4 million operating loss in 2012. However, in October 2011, Mr. Becker correctly projected Rockwood's earnings before interest, taxes, depreciation, and amortization (EBITDA) as showing a $12 million operating loss in 2012. This projection was significantly important to investors and creditors as a measure of Rockwood's and, by relation, CHS's financial health. Additionally, CHS had to report this projection to the U.S. Securities and Exchange Commission (SEC). As CFO, Mr. Becker had to ensure this projection was not false or misleading.

Rockwood and CHS demanded Mr. Becker recalculate his EBITDA projection to show a target $4 million operating loss in 2012. Mr. Becker refused to submit the $4 million figure because he reasonably believed it would require overstating income and understating expenses, fraudulently misleading investors and creditors in violation of criminal laws. Rockwood and CHS rated his job performance as "'unacceptable,'" placed him on a probationary "'performance improvement plan,'" and gave him an ultimatum to either submit the $4 million figure or lose his job. Clerk's Papers (CP) at 735-36. Then, he told Rockwood's chief executive officer (CEO) and CHS's internal auditor he thought Rockwood and CHS were using the false $4 million figure to fraudulently mislead investors and creditors. Mr. Becker hypothesized that, upon acquiring Rockwood, CHS procured investments and credits using the false $4 million

2

figure. He reported his concerns to Rockwood and CHS but did not report the misconduct to law enforcement agencies. Soon, Mr. Becker saw signs that Rockwood and CHS were preparing to use his subordinate to submit the false $4 million figure under the auspices of his department. Mr. Becker detailed these matters in writing to Rockwood and CHS, advising them he would have no choice but to resign unless they responded appropriately to abate the misconduct. They sent him a one-line e-mail accepting his resignation the next day.

In February 2012, Mr. Becker sued in superior court for wrongful discharge in violation of public policy. He additionally filed a whistleblower retaliation complaint with the U.S. Occupational Safety and Health Administrative (OSHA). Apparently, his OSHA complaint remains unresolved. Rockwood and CHS removed his civil suit to federal district court. But after Mr. Becker amended his complaint to remove references to federal law, the federal district court remanded his case.

Back in superior court, Rockwood and CHS moved unsuccessfully to dismiss Mr. Becker's amended complaint under CR 12(b)(6) for failure to state a cognizable claim for relief. The trial court certified the ruling for interlocutory review regarding whether Mr. Becker can establish the jeopardy element in his claim for wrongful discharge in violation of public policy. This court granted discretionary review regarding whether other available means for promoting the public policy of honesty in corporate financial reporting are adequate.

No. 31234-8-III
*Becker v. Cmty. Health Sys. Inc.*

ANALYSIS

The issue is whether the trial court erred under CR 12(b)(6) in declining to dismiss Mr. Becker's claim for wrongful discharge in violation of public policy. Rockwood and CHS contend Mr. Becker cannot establish the jeopardy element because a myriad of statutes and regulations adequately promote the public policy of honesty in corporate financial reporting, rendering a private common law tort remedy superfluous. Our review is de novo. *See Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 182, 125 P.3d 119 (2005); *Hoffer v. State*, 110 Wn.2d 415, 421, 755 P.2d 781 (1988).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." CR 8(a)(1). Otherwise, a trial court may dismiss the complaint on motion for "failure to state a claim upon which relief can be granted." CR 12(b)(6). Dismissal is proper if, accepting all factual allegations as true, "it appears beyond doubt that the plaintiff can prove no set of facts, consistent with the complaint, which would entitle the plaintiff to relief." *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 961, 577 P.2d 580 (1978); *see Barnum v. State*, 72 Wn.2d 928, 929-30, 435 P.2d 678 (1967). Thus, dismissal is proper where the plaintiff has an "'insuperable bar to relief'" appearing on the face of the complaint. *Hoffer*, 110 Wn.2d at 421 (quoting 5 CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE § 1357, at 604 (1969)); *accord Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994). We will consider hypothetical situations, including facts argued for the first time on appeal, that the complaint could conceivably allege to justify relief for the plaintiff. *Halvorson v.*

4

*Dahl*, 89 Wn.2d 673, 674-75, 574 P.2d 1190 (1978); *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995).

Washington provides a private common law tort remedy when an employer discharges an at-will employee "for a reason that contravenes a clear mandate of public policy."[1] *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 233, 685 P.2d 1081 (1984). This claim usually arises where the employer discharges the employee for (1) "refusing to commit an illegal act"; (2) "performing a public duty or obligation"; (3) "exercis[ing] a legal right or privilege"; or (4) engaging in "'whistleblowing' activity." *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989). But the elements are the same regardless of what conduct prompts this claim.

To prevail on a claim of wrongful discharge in violation of public policy, a plaintiff must establish (1) "the existence of a clear public policy (the *clarity* element)"; (2) "that discouraging the conduct in which [the plaintiff] engaged would jeopardize the public policy (the *jeopardy* element)"; (3) "that the public-policy-linked conduct caused the dismissal (the *causation* element); and (4) "[t]he defendant [is not] able to offer an overriding justification for the dismissal (the *absence of justification* element)." *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (adopting these elements from HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES §§ 3.7, .14, .19, .21 (1991) [hereinafter PERRITT, WORKPLACE TORTS]). The parties dispute whether Mr. Becker's amended complaint establishes the jeopardy element.

---

[1] This claim is available regardless of whether the employer discharges the employee expressly or constructively. *Korslund*, 156 Wn.2d at 177 (citing *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 238, 35 P.3d 1158 (2001)).

5

To establish the jeopardy element, the plaintiff must show he or she "engaged in particular conduct, and the conduct *directly relates* to the public policy, or was necessary for the effective enforcement of the public policy." *Id.* at 945 (citing PERRITT, WORKPLACE TORTS, *supra*, § 3.14, at 75-76). Thus, the plaintiff must argue "'other means for promoting the policy . . . are inadequate.'" *Id.* (omission in original) (quoting PERRITT, WORKPLACE TORTS, *supra*, § 3.14, at 77). In other words, the plaintiff must argue the actions he or she took were the "*only available adequate means*" to promote the public policy. *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 222, 193 P.3d 128 (2008).

Our Supreme Court first recognized the claim of wrongful discharge in violation of public policy in *Thompson*, 102 Wn.2d at 232. There, a divisional controller sued his corporate employer, alleging the employer discharged him, as a warning to other controllers, for instituting accurate accounting procedures complying with the Foreign Corrupt Practices Act of 1977 (FCPA), 15 U.S.C. §§ 78m, 78dd-1 to -2, 78ff. *Id.* at 223, 234. The *Thompson* court held the divisional controller could recover under a private common law tort remedy if he could prove his allegations. *Id.* at 234. The court reasoned the employer's action would contravene the public policy prohibiting bribery of foreign officials and requiring transparency in accounting by discouraging other controllers from complying with the FCPA. *Id.* at 234.

Our Supreme Court first articulated and applied the jeopardy element in *Gardner*, 128 Wn.2d at 941, 945-46. There, an armored vehicle driver sued his employer for wrongful discharge in violation of public policy, alleging the employer discharged him for

exiting the vehicle to disarm an attacker inside a bank. *Id.* at 933-35. The *Gardner* court concluded the threat of discharge would jeopardize the public policy of supporting altruism and protecting human life by discouraging an employee like the driver from rescuing a person from imminent life threatening harm. *Id.* at 945-46. The court reasoned the driver's conduct was both directly related to the public policy and necessary to effectively promote the public policy. *Id.* While the driver technically could have remained in the vehicle and summoned help through its radio, public address system, or siren, the court reasoned his conduct was the only available adequate means for serving the public policy because other people were not then prepared to help. *Id.* at 935, 945-46.

In *Korslund*, 156 Wn.2d at 182-83, our Supreme Court held the comprehensive remedies available under the Energy Reorganization Act of 1979 (ERA), 42 U.S.C. § 5851, adequately promoted public health and safety, and prevented fraudulent use of public funds in the nuclear industry. Specifically, the ERA prohibits specific employers from taking adverse employment action against employees for, among other things, reporting violations of nuclear industry laws. 42 U.S.C. § 5851(a). If an employer takes adverse employment action, the employee may complain to an administrative agency with power to investigate the claim. *Id.* § 5851(b)(1)-(2)(A). If the agency decides the claim has merit, the ERA requires it to order the employer abate the violation; reinstate the employee to his or her former position with the same compensation and employment terms, conditions, and privileges; and pay the employee back pay, compensatory damages, as well as attorney and expert fees and costs. *Id.* §

5851(b)(2)(B). But if the agency does not decide within one year, the ERA allows the employee to sue the employer in federal district court. *Id.* § 5841(b)(4). Because these remedies adequately promoted the relevant public policy, the *Korslund* court was unwilling to provide a private common law tort remedy. *See* 156 Wn.2d at 182-83.

In *Cudney v. ALSCO, Inc.*, 172 Wn.2d 524, 531-33, 259 P.3d 244 (2011), our Supreme Court held the robust remedies available under the Washington Industrial Safety and Health Act of 1973 (WISHA), RCW 49.17.160, adequately promoted workplace safety. Specifically, WISHA prohibits general employers from taking adverse employment action against employees for, among other things, reporting violations of workplace safety laws. RCW 49.17.110, .160(1). If an employer takes adverse employment action, the employee may complain to an administrative agency with power to investigate the claim. RCW 49.17.160(2). If the agency decides the claim has merit, WISHA requires it to sue the employer in superior court on behalf of the employee. *Id.* But if the agency decides the opposite, WISHA allows the employee to sue the employer in superior court on his or her own behalf. *Id.* In either case, the court may order all appropriate relief, including requiring the employer to cease the violation as well as restore and compensate the employee. *Id.* Again, because these remedies adequately promoted the relevant public policy, the *Cudney* court was unwilling to recognize a provide common law tort remedy. *See* 172 Wn.2d at 536, 538.

In *Cudney*, our Supreme Court additionally held law enforcement action available under Washington statutes criminalizing drunk driving adequately protected the public from drunk driving. *Id.* at 536-38. There, the employee reported to his private employer

8

that his supervisor drove a company vehicle while intoxicated. *Id.* at 527-28. But the employee did not inform law enforcement agencies, who theoretically could have stopped the supervisor. *Id.* at 537. In those circumstances, the *Cudney* court could not say the actions the employee took were the 'only available adequate means' to protect the public from drunk driving. *Id.* at 536-38.

Then, in *Piel v. City of Federal Way*, 177 Wn.2d 604, 609-17, 306 P.3d 879 (2013), our Supreme Court held the administrative remedies available through the Public Employment Relations Commission (PERC) under chapter 41.56 RCW were inadequate, on their own, to fully vindicate public policy when a public employer discharges a public employee for asserting collective bargaining rights. Unlike *Korslund* and *Cudney*, *Piel* involved a prior case holding PERC remedies failed to fully address the broader public interests involved because it protected personal contractual rights solely. *Id.* at 616-17 (quoting *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 805, 809, 991 P.2d 1135 (2000)). And unlike *Korslund* and *Cudney*, *Piel* involved a statute declaring PERC remedies supplement others and must be liberally construed to accomplish their purpose. *Id.* at 617 (quoting RCW 41.56.905). In those circumstances, the *Piel* court recognized a private common law tort remedy as necessary to fully vindicate public policy. *Id.* at 617.

Meanwhile, our Division of this court issued two opinions adhering to *Korslund* and *Cudney*, though our Supreme Court recently remanded one case for reconsideration in light of *Piel*. *See Worley v. Providence Physician Servs. Co.*, 175 Wn. App. 566, 574-76, 307 P.3d 759 (2013) (holding whistleblower protections available

9

under the Washington health care act, RCW 43.70.075, adequately promoted workplace safety, ensured compliance with the accepted standard of care, and prevented fraudulent billing in the health care industry); *Rose v. Anderson Hay & Grain Co.*, 168 Wn. App. 474, 478-79, 276 P.3d 382 (2012) (holding the employee remedies available under the Commercial Motor Vehicle Safety Act, 49 U.S.C. § 31105, adequately protected truck drivers who refuse to violate commercial motor vehicle safety laws, even though a statute declared these remedies do not preclude others), *remanded,* ___ Wn.2d ___, 2014 WL 1325569. Division One of this court issued another opinion applying *Korslund* and *Cudney*, and our Supreme Court denied review of that case despite *Piel. See Weiss v. Lonnquist*, 173 Wn. App. 344, 353-60, 293 P.3d 1264 (holding the misconduct reporting and disciplinary process prescribed by the Washington Rules of Professional Conduct, RPC 3.3 and 8.3, adequately promoted attorney candor toward the tribunal), *review denied*, 178 Wn.2d 1025 (2013).

Our recent cases faithfully analyzed the jeopardy element in a manner we thought the reasoning of *Korslund* and *Cudney* required. We now realize our jeopardy analysis overemphasized the abstract adequacy of statutes and regulations while forgetting the concrete public policy impact of chilling protected employee conduct. *See* HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW AND PRACTICE § 7.06[A], at 7-82.1 to .4 (Supp. 2013) [hereinafter PERRITT, EMPLOYEE DISMISSAL]. This approach tended to foreclose private common law tort remedies for employees any time statutes or regulations provided some means of promoting public policy. *See Cudney*, 172 Wn.2d at 548 (Stephens, J., dissenting). But doing so actually undermined public policy

10

enforcement by chilling employee conduct advocating compliance with statutes and regulations. *See* PERRITT, EMPLOYEE DISMISSAL, *supra*, § 7.06[A], at 7-82.3 to.4-1; *id.* § 7.09[D], at 7-173 (5th ed. 2006). Thus, in Mr. Becker's case, we reform our jeopardy analysis under the reasoning of *Thompson, Gardner,* and *Piel.*

As the trial court concluded, Mr. Becker's amended complaint implicates the public policy of honesty in corporate financial reporting because he alleged he was constructively discharged after refusing to submit a false or misleading EBITDA projection. To establish the jeopardy element, Mr. Becker must show the threat of constructive discharge would jeopardize the public policy of honesty in corporate financial reporting by discouraging a CFO like him from refusing to submit a false or misleading EBITDA projection. Mr. Becker's refusal must have been either directly related to the public policy or necessary to effectively enforce the public policy. Thus, Mr. Becker's refusal must have been the only available adequate means for promoting the public policy. For the reasons discussed below, we think it undoubtedly was.

Initially, the parties dispute whether Mr. Becker's case concerns constructive discharge for refusing to commit an illegal act, engaging in whistleblower activity, or both. But Mr. Becker clearly elected his legal theory where he alleged, "Rockwood and CHS engaged in retaliation and in adverse employment action against [Mr. Becker] *for his refusal* to engage in improper accounting practices" involving "illegal and unethical acts." CP at 744 (emphasis added). Mr. Becker did not allege Rockwood and CHS constructively discharged him for engaging in whistleblower activity. However, any

11

whistleblower options available to him are still relevant in determining whether his refusal was the only available adequate means for promoting the public policy.

The parties mainly dispute if other available means for promoting the public policy of honesty in corporate financial reporting are adequate in Mr. Becker's case. First, Rockwood and CHS cite section 806(a) of the Sarbanes-Oxley Act of 2002 (SOX), 18 U.S.C. § 1514A, and section 922(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6. These statutes provide comprehensive whistleblower protections. *See* 15 U.S.C. § 78u-6(h)(1)-(2); 18 U.S.C. § 1514A(a)-(c). These statutes apply even when an employee reports misconduct he or she reasonably believes is "about to" or "'likely to'" occur. 12 C.F.R. § 240.21F-2(b)(1)(i) (implementing 15 U.S.C. § 78u-6); *Wiest v. Lynch*, 710 F.3d 121, 133 (3d Cir. 2013) (quoting *Sylvester v. Parexel Int'l LLC*, No. 07-123, 2011 WL 2165854, at *13 (U.S. Dep't of Labor Admin. Review Bd. May 25, 2011)) (construing 18 U.S.C. § 1514A). But because these statutes declare their remedies do not preclude others, *see* 15 U.S.C. § 78u-6(h)(3); 18 U.S.C. § 1514A(d), we have the "strongest possible evidence" these remedies are inadequate, on their own, to fully vindicate public policy, *Piel*, 177 Wn.2d at 617. Therefore, we do not reach the parties' remaining arguments on these statutes.

Second, Rockwood and CHS cite numerous statutes imposing criminal penalties on a person responsible for false or misleading statements related to corporate financial reporting. SOX section 302(a) requires both a CEO and CFO to certify in periodic corporate financial reports that

>  (2) based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;
>  (3) based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the [corporation] as of, and for, the periods presented in the report.

15 U.S.C. § 7241(a). SOX section 906(a) imposes criminal penalties on a CEO or CFO who willfully certifies the report knowing it contains a false or misleading statement. 18 U.S.C. § 1350(c)(1)-(2). Under long-standing criminal principles, a corporation is responsible for the crime of its CEO or CFO if the corporation "aids, abets, counsels, commands, induces or procures [the] commission [of that crime]." 18 U.S.C. § 2(a).

SOX section 903(a) and (b) enhance criminal penalties for mail fraud and wire fraud while section 807(a) separately criminalizes securities fraud. 18 U.S.C. §§ 1341, 1343, 1348. Under SOX section 902(a), attempting or conspiring to commit any of these crimes invokes "the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

Section 24 of the Securities Act of 1933, 15 U.S.C. § 77x, and section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff(a), impose criminal penalties on a person who willfully violates securities laws, including by knowingly making false or misleading statements related to corporate financial reporting or connected to the offer or sale of securities. *See also* Securities Act § 17(a), 15 U.S.C. §§ 77q(a); Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Moreover, SOX section 1107(a) imposes criminal penalties on a person who

"knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the . . . possible commission of any Federal offense." 18 U.S.C. § 1513(e).

Even a state statute imposes criminal penalties on a corporate agent who "knowingly make[s] or publish[es] or concur[s] in making or publishing any written . . . report . . . or statement of [the corporation's] affairs or pecuniary condition, containing any material statement that is false or exaggerated." RCW 9.24.050. This statute exists to protect members of the public who may rely on such reports or statements but are not conversant with the corporation's finances. *State v. Swanson*, 16 Wn. App. 179, 185-86, 554 P.2d 364 (1976) (citing *State v. Pierce*, 175 Wash. 461, 467, 27 P.2d 1083 (1933); *State v. O'Brien*, 143 Wash. 636, 639, 255 P. 952 (1927)). Attempting, conspiring, or soliciting another person to commit this crime is also a crime. RCW 9A.28.020(1), .030(1), .040(1).

Third, Rockwood and CHS cite statutes and regulations providing an investor a private right of action against a person responsible for false or misleading statements connected to the offer or sale of securities.[2] *See* Securities Exchange Act § 10(b), 15

---

[2] Accepting all factual allegations as true, we assume, without deciding, the EBITDA projection Rockwood and CHS demanded would not have been protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5(c)(1). The projection certainly would have been a forward-looking statement. *See id.* § 78u-5(i)(1); *Prime Mover Capital Partners L.P. v. Elixir Gaming Techns., Inc.*, 898 F. Supp. 2d 673, 689 & n.95 (S.D.N.Y. 2012) (citing *Slayton v. Am. Express Co.*, 604 F.3d 758, 766-67 (2d Cir. 2010)). But the complaint implies Rockwood and CHS knew the projection would have been false or misleading, and material to investors and creditors. *See* 15 U.S.C. § 78u-5(c)(1)(A)(ii), (B). Because

14

U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; Securities Act of Washington, RCW 21.20.010, .430(1); *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971); *Janus Capital Grp., Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296, 2301, 180 L. Ed. 2d 166 (2011).

Finally, Rockwood and CHS cite statutes granting the SEC administrative powers against a person responsible for false or misleading statements connected to the offer or sale of securities. Specifically, the SEC may initiate an investigation upon complaint or its own initiative, and, if it determines a person has violated or is about to violate securities laws, it may issue a cease and desist order; impose civil monetary penalties; and sue in federal district court for injunctive relief, disgorgement of profits, prohibition from future service as a corporate director or officer, and additional civil monetary penalties. *See* Securities Act §§ 8A, 20, 15 U.S.C. §§ 77h-1, 77t; Securities Exchange Act §§ 21, 21B, 21C, 15 U.S.C. §§ 78u, 78u-2, 78u-3.

These statutes and regulations provide comprehensive criminal, civil, and administrative enforcement mechanisms promoting the important public policies they secure. But those means of promoting public policy do not foreclose private common law tort remedies for employees. *See Cudney*, 172 Wn.2d at 549-50 (Stephens, J., dissenting). "The central idea of the public policy tort is to create privately enforceable disincentives for . . . employers to use their power in the workplace to undermine important public policies." PERRITT, EMPLOYEE DISMISSAL, *supra*, § 7.06[A], at 7-82.3 (Supp. 2013). And the public policy tort may sometimes coexist with comprehensive

the pleadings do not address the issue, we do not consider whether the projection

criminal, civil, and administrative enforcement mechanisms. *See Piel*, 177 Wn.2d at 614-16. Such coexistence is essential where, as here, the threat of constructive discharge would jeopardize the public policy of honesty in corporate financial reporting by discouraging a CFO like Mr. Becker from refusing to submit a false or misleading EBITDA projection.

Mr. Becker claimed his EBITDA projection correctly showed a $12 million operating loss in 2012 but Rockwood and CHS demanded he recalculate his projection to show a target $4 million operating loss in 2012. Mr. Becker refused to submit the $4 million figure because he reasonably believed it would require overstating income and understating expenses, fraudulently misleading investors and creditors in violation of criminal laws. Rockwood and CHS rated his job performance as "'unacceptable,'" placed him on a probationary "'performance improvement plan,'" and gave him an ultimatum to either submit the $4 million figure or lose his job. CP at 735-36. Then, he told Rockwood's CEO and CHS's internal auditor he thought Rockwood and CHS were using the false $4 million figure to fraudulently mislead investors and creditors. Mr. Becker hypothesized that, upon acquiring Rockwood, CHS procured investments and credits using the false $4 million figure. He reported his concerns to Rockwood and CHS but did not report the misconduct to law enforcement agencies. Soon, Mr. Becker saw signs that Rockwood and CHS were preparing to use his subordinate to submit the false $4 million figure under the auspices of his department. Mr. Becker detailed these matters in writing to Rockwood and CHS, advising them he would have no choice but to

would have contained any meaningful cautionary statement. *See id.* § 78u-5(c)(1)(A)(i).

resign unless they responded appropriately to abate the misconduct. They sent him a one-line e-mail accepting his resignation the next day.

Mr. Becker's case is "[t]he most compelling case for protection" under a public policy tort because by instructing him to commit a crime for which he would be personally responsible, Rockwood and CHS forced him to choose between the consequences of disobeying his employer and the consequences of disobeying criminal laws. JANIE F. SCHULMAN & NANCY M. MODESITT, WHISTLEBLOWING: THE LAW OF RETALIATORY DISCHARGE ch. 5.II.A.1., at 101 (2d ed. 2004). Recognizing this dilemma, "most courts have readily responded . . . by recognizing a cause of action" in similar cases. *Id.* ch. 5.II.A.1.a., at 102; *see also id.* ch. 5.II.A.1.a., at 5-7 (Supp. 2013).

For example, in *McGarrity v. Berlin Metals, Inc.*, 774 N.E.2d 71, 75-79 (Ind. Ct. App. 2002), a CFO sued his corporate employer for wrongful discharge in violation of public policy, alleging the employer discharged him for refusing to fraudulently underreport tax liability in violation of criminal laws. The trial court granted the employer judgment on the evidence and the Indiana Court of Appeals reversed, partly reasoning the common law would not countenance a scenario where the employer could abuse its workplace authority by giving the CFO an ultimatum to either commit an illegal act for which he would be personally responsible or lose his job. *Id.* at 76-78.

Similarly, in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 779-80 (Tenn. 2010), a CFO sued his corporate employer for wrongful discharge in violation of public policy, alleging the employer discharged him for refusing to make misleading account alterations that would have produced misleading SEC filings. The trial court granted the

17

employer summary judgment and the Tennessee Supreme Court reversed, partly

reasoning the common law did not require the CFO to show he reported the misconduct

externally after he refused to participate in it. *Id.* at 787-89.

The jeopardy analysis in Mr. Becker's case "proceeds from the proposition that

permitting such dismissals would encourage conduct in violation of [criminal laws],

because employers could shield themselves from detection." PERRITT, EMPLOYEE

DISMISSAL, *supra*, § 7.06, at 7-72 (Supp. 2012). We recognize the jeopardy element is

difficult to satisfy where, as here, statutes and regulations provide comprehensive

criminal, civil, and administrative enforcement mechanisms promoting the important

public policies they secure. *See id.* § 7.06, at 7-69 to -71. But the jeopardy analysis in

Mr. Becker's case does not end there. The jeopardy element becomes easier to satisfy

where, as here, the employee has special responsibilities or expertise connected with

the public policy and other enforcement mechanisms are less likely to succeed because

they depend on the employee's individual pro-compliance efforts. *See id.* § 7.06, at 7-

71; *id.* § 7.09[D], at 7-159 (5th ed. 2006). In those circumstances, chilling employee

conduct advocating compliance with statutes and regulations renders public policy

enforcement uncertain, at best, or a matter of chance, at worst. *See Cudney,* 172

Wn.2d at 548-49 (Stephens, J., dissenting); PERRITT, EMPLOYEE DISMISSAL, *supra,* §

7.06[A], at 7-82.4-1 (Supp. 2013).

In sum, we follow the reasoning of *Thompson, Gardner,* and *Piel* to conclude Mr.

Becker's amended complaint establishes the jeopardy element. Accepting all factual

allegations as true, the threat of constructive discharge would jeopardize the public

No. 31234-8-III
*Becker v. Cmty. Health Sys. Inc.*

policy of honesty in corporate financial reporting by discouraging a CFO like Mr. Becker from refusing to submit a false or misleading EBITDA projection. Mr. Becker's refusal was both directly related to the public policy and necessary to effectively enforce the public policy. And, Mr. Becker's refusal was the only available adequate means for promoting the public policy, given the uncertainty of other enforcement mechanisms and their dependence on his individual pro-compliance efforts. We must evaluate each public policy tort "in light of its particular context." *Piel*, 177 Wn.2d at 617. Because *Korslund* and *Cudney* addressed different enforcement mechanisms, they do not dictate the outcome in Mr. Becker's case. *See id.* Therefore, the trial court did not err under CR 12(b)(6) in declining to dismiss Mr. Becker's claim for wrongful discharge in violation of public policy.

Affirmed.

Brown, A.C.J.

I CONCUR:

Lawrence-Berrey, J.

19

No. 31234-8-III

FEARING, J. (concurring) — The author of the lead opinion admirably analyzes the tort of wrongful discharge in violation of public policy and the tort's jeopardy element, and I concur in the decision of the majority. I agree with the majority that the statutes and regulations, upon which Rockwood Clinic and its parent relies, are closer in nature to the statutes and regulations at issue in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984) and *Piel v. City of Federal Way*, 177 Wn.2d 604, 609-17, 306 P.3d 879 (2013) rather than at issue in *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 125 P.3d 119 (2005) and *Cudney v. ALSCO, Inc.*, 172 Wn.2d 524, 531-33, 259 P.3d 244 (2011). More importantly, I accept the significance of the majority's observation that the Sarbanes-Oxley Act of 2002 (SOX) and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), despite including comprehensive whistleblower protections, declare their remedies to be nonexclusive. *See* 15 U.S.C. § 78u-6(h)(3); 18 U.S.C. § 1514A(d).

I write separately, however, because I cannot reconcile the teachings of *Piel* and *Cudney*. Yes, one may find distinguishing features between the two decisions, but those differences pale in importance when considering principles upon which the jeopardy element is based. The two decisions, combined with other high court opinions, create confusion amongst practitioners and lower court judges as to the nature and extent of the jeopardy element of a claim for wrongful discharge in violation of public policy. In

addition to deciding disputes between parties, appellate decisions are meant to declare and explain law and to provide guidance to lawyers, litigants, and lower courts, particularly when a busy tort is the subject matter. Pronouncements on the subject of the jeopardy element offer puzzlement, not direction. I thought, upon reading the ruling in *Cudney*, that the tort languidly lay, on life support, in the intensive care unit. *Piel* revived the tort. But practitioners and trial courts must wonder if the next decision will return the tort to the sick bay.

As a cause of action matures, courts insist on promulgating a list of elements necessary to a successful suit. Therefore, in *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996), the state high court congealed a claim for wrongful discharge in violation of public policy into four elements by relying on the treatise, HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES (1991). As one of the four elements, plaintiff must establish that discouraging the conduct in which the plaintiff engaged would jeopardize the public policy. The purpose of the jeopardy element is to guarantee "'an employer's personnel management decisions will not be challenged unless a public policy is genuinely threatened.'" *Ellis v. City of Seattle*, 142 Wn.2d 450, 460, 13 P.3d 1065 (2000) (quoting *Gardner*, 128 Wn.2d at 941-42). The jeopardy element was implicitly already part of a prima facie case since the

2

plaintiff needed to prove his or her firing contravened a clear mandate of public policy. *Thompson*, 102 Wn.2d at 232.

As elements emerge from the legal kiln, courts enamel each element with unnecessary gloss. *Gardner* went beyond listing jeopardy as one of the four elements of the tort of wrongful discharge. The landmark decision added a fluffy description of the element, fraught with ambiguity and nuance that created the puzzlement about which I write. A critical passage in *Gardner* lies on page 945:

> [1] Under the second element, the employee's discharge must jeopardize the public policy. [2] To establish jeopardy, plaintiffs must show they engaged in particular conduct, and the conduct *directly relates* to the public policy, or was *necessary* for the effective enforcement of the public policy. [Henry H.] Perritt, [Jr., *Workplace Torts: Rights and Liabilities*] § 3.14, at 75-76. [3] This burden requires a plaintiff to "argue that other means for promoting the policy . . . are inadequate." Perritt § 3.14, at 77. [4] Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct.

128 Wn.2d at 945. I numbered the sentences for ease of discussion. Unfortunately, the *Gardner* decision did not limit its description of the jeopardy element to the first sentence or initial statement that discouraging the plaintiff's conduct must jeopardize public policy.

The *Gardner* court wrote in the second sentence of the passage that, to establish the jeopardy element, plaintiff must also show the particular conduct, in which she engaged, *directly relates* to the public policy, or was *necessary* for the effective

3

enforcement of the public policy. 128 Wn.2d at 945 (citing PERRITT § 3.14, at 75-76).

Note that this component of the jeopardy element is in the alternative. The sentence

employs the word "or." This "language is a paraphrase of Perritt's treatise (1991), which

clearly states the jeopardy analysis in the disjunctive, i.e., the conduct furthers public

policy *either* because the policy directly promotes the conduct *or* because the conduct is

necessary to effective enforcement of the policy. PERRITT, *supra* § 3.14, at 75-76."

*Cudney*, 172 Wn.2d at 540 (Stephens, J., dissenting). If the plaintiff proves her conduct

directly relates to a public policy, she should not need to prove her conduct was necessary

to effectively enforce the policy. The tort of wrongful discharge in violation of public

policy would be easier to apply if *Gardner* ended its discussion of the jeopardy element

there.

*Gardner* added two more sentences. The third sentence reads, "This burden

requires a plaintiff to 'argue that other means for promoting the policy . . . are

inadequate.'" 128 Wn.2d at 945 (quoting PERRITT § 3.14, at 77). This third sentence

launched the many appellate decisions that give rise to the current unpredictability

particularly because its relationship to the second or previous sentence in *Gardner* lacks

exposition. Showing the lack of other means to enforce the public policy should not be a

requirement if the plaintiff's conduct directly relates to the public policy. Showing the

lack of another adequate means of enforcing the public policy should only be required if

the plaintiff seeks to prove the tort by showing her conduct was necessary to effectively enforce the policy.

*Gardner* added even more language to the jeopardy element that now frequently introduces a case's discussion of the element. In the fourth sentence, the high court wrote, "Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct." *Gardner*, 128 Wn.2d at 945.

In later decisions, the state high court imposed more restrictions to the jeopardy element. For instance, in order to establish the jeopardy element, a plaintiff must show that the actions the plaintiff took were the "'*only available adequate means*'" to promote the public policy. *Cudney*, 172 Wn.2d at 530 (quoting *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 222, 193 P.3d 128 (2008)). The point of the jeopardy prong of the tort is to consider whether the statutory protections are adequate to protect the public policy, not whether the claimant could recover more through a tort claim. *Cudney*, 172 Wn.2d at 534. Going even further, the other means of promoting the public policy need not be available to a particular individual so long as the other means are adequate to safeguard the public policy. *Hubbard v. Spokane County*, 146 Wn.2d 699, 717, 50 P.3d 602 (2002) (citing PERRITT, *supra*, § 3.14, at 77). As can be seen, the jeopardy element is encumbered with many layers of rules beyond the employee simply showing that her conduct directly related to the public policy.

5

Decision after decision has impliedly held that regardless of whether plaintiff's conduct directly relates to the public policy, plaintiff must prove that means other than her civil lawsuit for damages are inadequate to enforce the public policy. *Piel*, 177 Wn.2d 604; *Cudney*, 172 Wn.2d 524; *Danny*, 165 Wn.2d 200; *Korslund*, 156 Wn.2d 168; *Hubbard*, 146 Wn.2d 699; *Ellis*, 142 Wn.2d 450; *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 991 P.2d 1135 (2000); *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991); *Worley v. Providence Physician Servs. Co.*, 175 Wn. App. 566, 307 P.3d 759 (2013); *Weiss v. Lonnquist*, 173 Wn. App. 344, 359, 293 P.3d 1264, *review denied*, 178 Wn.2d 1025 (2013); *Rose v. Anderson Hay & Grain Co.*, 168 Wn. App. 474, 276 P.3d 382 (2012); *review granted*, 180 Wn.2d 1001, 327 P.3d 613 (2014); *Wilson v. City of Monroe*, 88 Wn. App. 113, 123-24, 943 P.2d 1134 (1997). Stated differently, if another *"available adequate means"* promotes the public policy, plaintiff loses even if her conduct directly impacts the public policy. *Danny*, 165 Wn.2d at 222. Nearly all, if not all, public policies have alternative means for enforcement.

Washington decisions often entail reviewing a statutory scheme to determine whether the other available remedies are adequate, and, more in particular, whether the remedies are adequate for the fired employee. Nevertheless, according to another inconsistent rule, whether remedies are adequate for the employee should be immaterial since the other means of promoting the public policy need not be available to a particular

6

individual so long as the other means are adequate to safeguard the public policy. *Hubbard*, 146 Wn.2d at 717.

Cases irreconcilably examine whether the other means are "adequate." For example, some decisions stand for the proposition that statutory remedies are inadequate, for purposes of the jeopardy element, when the remedies may not allow recovery of emotional distress damages for the discharged employee. *Piel*, 177 Wn.2d 604; *Smith*, 139 Wn.2d 793; *Wilmot*, 118 Wn.2d 46; *Wilson*, 88 Wn. App. 113. Both *Piel* and *Smith* address RCW 41.56.160, a portion of the Public Employees Relations Act. The statute allows the Public Employees Relations Commission to award "payment of damages and the reinstatement of employees" if the employer engages in an unfair labor practice. RCW 41.56.160. Each plaintiff was permitted to proceed with his or her tort claim because whether emotional distress damages could be awarded under the statute was not clear.

*Wilmot*, 118 Wn.2d 46, examined RCW 51.48.025(4), which prohibits an employer from discharging an employee for filing a workers compensation claim. The statute authorizes the director of the Department of Labor & Industries (Department) to sue, on behalf of the employee, in superior court, and for the court "to order all appropriate relief including rehiring or reinstatement of the employee with back pay." RCW 51.48.025(4). The *Wilmot* court also allowed the employee to proceed with a tort

7

action because it was unclear whether the statute allowed for an award of emotional distress damages.

*Wilson*, 88 Wn.2d 113, explored RCW 49.17.160, a portion of the Washington Industrial Safety and Health Act, which prohibits an employer from discriminating against an employee who files a complaint about work safety with the Department of Labor & Industries. The statute allows an employee to file a complaint of discrimination with the Department, and, if the Department refuses to file suit against the employer, the employee may file suit on his own. The statute allows the superior court "for cause shown, . . . restrain violations . . . and order all appropriate relief including rehiring or reinstatement of the employee to his or her former position with back pay." RCW 49.17.160. The *Wilson* court allowed the employee to proceed with a private suit because it was unclear whether the statute allowed for an award of emotional distress damages.

But *Piel, Wilmot,* and *Wilson* conflict with *Cudney*, which teaches that whether the claimant could recover more through a tort claim is irrelevant to the jeopardy analysis. Therefore, whether plaintiff can recover emotional distress damages under an alternative remedy should be unimportant.

*Cudney* addresses the same statute, RCW 49.17.160, as *Wilson*. The two cases have conflicting outcomes. Although *Wilson* is a court of appeals decision, the majority decision in *Cudney* does not even mention *Wilson*. Nor does the majority decision in

8

*Cudney* mention established precedence that, if the employee cannot recover emotional distress damages under the alternate remedy, the plaintiff satisfies the jeopardy element. *Cudney* ignores rather than overrules the contradictory decisions.

*Wilson* contradicts *Jones v. Industrial Electric-Seattle, Inc.*, 53 Wn. App. 536, 539, 768 P.2d 520 (1989). In *Jones*, a worker also complained he was fired for reporting unsafe working conditions. Michael Jones, however, did not file a complaint with the Department within the 90-day time period afforded under the statute. This court dismissed his suit for wrongful discharge on the ground that he did not timely complain to the Department. *Wilson* did not mention the decision in *Jones*.

*Piel*, *Smith*, *Wilmot*, and *Wilson* also conflict with *Hubbard*, which instructs that the other means of promoting the public policy need not be available to the plaintiff. So, whether the plaintiff can recover any damages should be unimportant. The Public Employees Relations Act, the workers compensation laws, and the Washington Industrial Safety and Health Act of 1973 (WISHA) all provide remedies to punish employers who violate their provisions. These statutory schemes even afford some recovery for the discharged employee.

A principal basis upon which we base our decision, in the pending appeal, is language in SOX and Dodd-Frank that mentions its respective remedies are not exclusive. A number of decisions rely upon similar language in the statute being

9

examined. *Piel*, 177 Wn.2d 604; *Rose*, 168 Wn. App. at 478. But such statutory terms should be irrelevant in a jeopardy analysis, since the tort is independent of the statute and the tort fails if there is another remedy to enforce the public policy, regardless of whether the remedy benefits the discharged employee. *Cudney*, 172 Wn.2d 524; *Danny*, 165 Wn.2d at 222; *Hubbard*, 146 Wn.2d at 717. Also, decisions have allowed the employee to proceed with a private action even without such language in the pertinent statute. *Smith*, 139 Wn.2d 793; *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 888 P.2d 147 (1995); *Wilmot*, 118 Wn.2d 46; *Wilson*, 88 Wn. App. 113.

The majority in *Piel* distinguished between the statute at issue in its decision, RCW 41.56.905, and the statute at issue in *Cudney*. As previously mentioned, *Piel* involved the Public Employees Relations Act, which includes the language, "'The provisions of this chapter are intended to be additional to other remedies and shall be liberally construed to accomplish their purpose.'" *Piel*, 177 Wn.2d at 617 (quoting RCW 41.56.905). No similar language was identified in WISHA, the statutory scheme at issue in *Cudney*. This distinction between the two decisions is unsatisfactory given the other conflicting language between the two decisions. Also, the test is not whether the alternate remedy declares itself exclusive, but rather whether the remedy is adequate.

In short, *Cudney* and *Piel* cannot be reasonably reconciled. The dissent in *Cudney* is correct that the "result departs from long-standing precedent in Washington." *Cudney*,

10

172 Wn.2d at 538 (Stephens, J., dissenting). The dissent in *Piel* is also correct that "in *Cudney*, we emphasized that whether the jeopardy element is met hinges on the adequacy of the alternative remedies available to protect the public policy, not on whether the remedies fully compensate the individual claimant." *Piel*, 177 Wn.2d at 632-33 (Johnson, J.M., J., dissenting). *Cudney* and *Piel* begin at different departure points and travel in opposite directions. They are two ships passing in the dark of night because they seek to advance different objectives.

I could discuss other examples of pertinent inconsistencies in the jeopardy element's body of law. Examples include: whether the employee fulfills the jeopardy element when his theory focuses on his individual rights rather than the good of the community; whether there is another available adequate remedy when, to obtain the remedy, the employee must file an administrative complaint within a short time period; and whether the alternate remedy is adequate if the employee is not afforded a jury trial. Suffice it to say that the law of wrongful discharge in violation of public policy may advance by turning back time to before *Gardner*, when the employee only needed to show his discharge implicated a clear mandate of public policy. At least, the law could be more consistent if the jeopardy element faithfully followed the language in *Gardner* that the plaintiff need not show her private suit necessary to effective enforcement of the identified public policy as long as her conduct directly related to the policy.

11

The tort of wrongful termination in violation of public policy is independent of any underlying contractual agreement or statute. Therefore, Washington courts have held that an employee need not exhaust her contractual or administrative remedies to proceed before suing in tort. *Piel*, 177 Wn.2d at 612; *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 311, 96 P.3d 957 (2004); *Smith*, 139 Wn.2d at 808; *Allstot v. Edwards*, 116 Wn. App. 424, 431, 65 P.3d 696 (2003); *Young v. Ferrellgas, L.P.*, 106 Wn. App. 524, 530, 21 P.3d 334 (2001). For the same reason, other remedies that address the violation of public policy should not interfere with establishing the jeopardy element of the tort.

Jeopardy and the other three elements announced in *Gardner* come from a treatise about the tort, HENRY H. PERRITT JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES (1991). *Gardner*, 128 Wn.2d at 945. The four critical *Gardner* sentences concerning jeopardy also derive from the treatise. Although *Gardner* characterizes the Perritt treatise as "leading," one might question this characterization. Although we recognize Henry J. Perritt as an expert in employment law, Perritt fails to analyze the four sentences and the problems they create. The treatise is more a collection of decisions than it is a reasoned discussion of the tort of wrongful discharge.

*Gardner* lists *Collins v. Rizkana*, 73 Ohio St. 3d 65, 69-70, 652 N.E.2d 653 (1995), as the only decision to parrot Henry H. Perritt, Jr.'s, four elements of the tort of

wrongful discharge in violation of public policy and to have embraced the jeopardy element. A review of decisions across the United States suggests that only Iowa, Utah and Guam have since adopted Perritt's four elements of the tort. *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 n.2 (Iowa 2000); *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998); *Ramos v. Docomo Pacific, Inc.*, 2012 Guam 20, 2012 WL 6738152.

82 AM. JUR. 2D *Wrongful Discharge* § 54 (2014) proclaims what may be the majority rule in the United States:

> To prevail, an employee asserting a discharge that undermines public policy must establish a number of key elements, including the following:
> (1) the existence of a clear public policy;
> (2) that he or she was engaged in conduct protected by public policy;
> (3) that the employer knew or believed that the employee was engaged in a protected activity;
> (4) that retaliation was a motivating factor in the dismissal decision; and
> (5) that the discharge would undermine an important public policy.

(footnotes omitted). Note that neither jeopardy nor the lack of another adequate remedy is an element.

Interests and goals clash when determining the breadth of the tort of wrongful

discharge in violation of public policy. Society wishes employers to be free to discharge poor performing employees and render management decisions that will not be challenged unless strong public policies interfere. Society does not wish employees to win money by ginning false reasons for termination from employment. Nor does society wish the discharged employee to recover against the employer if the conduct that led to the discharge advanced the employee's own interests, rather than the interests of others or society as a whole. At the same time, society wishes to protect a giraffe, who heroically sticks his or her neck out and does good no matter the cost. The employee's actions in *Gardner* wonderfully illustrate such a heroic deed. If a heroic deed benefits the community but leads to the giraffe's firing, society prefers the employer, not the employee, pay for the loss suffered by the employee. Under such circumstances, the employer has engaged in intentional misconduct and should pay for the loss caused by its conduct.

A description of the tort of wrongful discharge that simply requires the employee to prove a clear mandate of public policy and her conduct directly relates to the policy serves these competing interests. The requirement of a clear manifestation of public policy limits the suits to worthwhile suits. The requirement of causation also limits

14

recovery to firings that intentionally flaunt a clear public policy. Requiring the

discharged employee to prove more compounds, confounds, and contorts the tort.

_____
Fearing, J.

I CONCUR:

_____
Lawrence-Berrey, J.

15